## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**WALTER G.. PECKHAM and**
**COURTNEY E. PECKHAM,**                        Chapter 7
     Debtors                              Case No. 08-14319-JNF


~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**RAYMOND LIDDELL,**
     Plaintiff
v.                                              Adv. P. No. 08-1246
**WALTER G. PECKHAM,**
     Defendant


~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the five-count Complaint commenced by Raymond

Liddell ("Liddell" or the "Plaintiff") against Walter G. Peckham ("Peckham"), pursuant to

11 U.S.C. § 523(a)(2)(A) and (a)(6).  The Court conducted a trial on June 23, 2010 and July

1, 2010 at which four witnesses testified and 41 exhibits were introduced into evidence.  At

the conclusion of the trial, both parties submitted post-trial briefs.

The issues presented include whether the Plaintiff sustained his burden of proof

under 11 U.S.C. § 523(a)(2)(A) and (a)(6), by establishing, based upon the preponderance

of the evidence, that Peckham obtained money for repairs to a piano owned by the Plaintiff

by means of false pretenses, false misrepresentations, or actual fraud, and whether

1

Peckham willfully and maliciously injured the Plaintiff by failing to respond to post-judgment discovery with respect to a default judgment obtained by the Plaintiff from the Cambridge District Court, resulting in this issuance of a civil arrest warrant and significant legal fees incurred by the Plaintiff.  Resolution of the issues depends in large measure on the credibility of the Plaintiff and Peckham.

The Court now makes its findings of fact and rulings of law in accordance with Fed. R. Bankr. P. 7052.

## II. FACTS

Peckham and his spouse, Courtney E. Peckham (collectively, the "Debtors"), filed a voluntary Chapter 7 petition on June 12, 2008.  At the time of the commencement of their Chapter 7 case, the Debtors owed significant debts to unsecured creditors, including a debt owed by Peckham to the Plaintiff arising out of a default judgment obtained on March 9, 2007 for conversion and unfair and deceptive trade practices under Mass. Gen. Laws ch. 93A in the sum of $27,988.  Additionally, the Debtors' residence, located at 66 Sumner Street, Gloucester, Massachusetts, which they purchased in 2001 for $200,000, was encumbered by an adjustable rate mortgage,[1] multiple recorded executions and an

---

[1] The adjustable rate promissory note secured by a mortgage in the amount of $336,000 had indicia of a subprime loan as, among other things, the loan was conditioned upon payment of a yield spread premium payable to the lender in the sum of $3,360.  Additionally, though Peckham grossly exaggerated his income on the loan application, the value of the property in relation to the amount of the loan was the obvious basis for the amount of loan, whose proceeds were used to pay over $50,000 to Alpha Holding Corporation, an entity which participated in the transfer of the property from the Debtors to a trust which held the deed to the property as part of a foreclosure rescue transaction.

attachment, arising out of a terminated commercial real estate lease for property formerly used by Peckham for his piano repair business.[2]

Peckham is a high school graduate. At the time of trial, he was in his early 50s and unemployed. Prior to the commencement of his bankruptcy case, he operated a piano repair business. After employment at a piano repair shop for five years, he opened his own piano repair shop in Gloucester, Massachusetts, known as Peckham Piano & Music Center, Inc., although the Debtors in their tax returns treated the business as a sole proprietorship. Initially, Peckham conducted his business from premises located on Washington Street in Gloucester. Subsequently, he moved his business operations at least three times, first to Maplewood Avenue, then to 72 Rogers Street, and finally to premises near the Walgreens Plaza in downtown Gloucester after he was evicted from the Rogers Street location by his landlord, Marshall A. Dana and David I. Stone, Trustees under the Will of Herman Dana; Marshall A. Dana, Surviving Trustee under the Will of Gertrude Dana Gordon; and Marshall A. Dana and Myer R. Dana, Trustees of Remdana Trust u/d/t dated January 2, 1990 (the "Landlord"). After his eviction from the Rogers Street premises in January of 2007, Peckham's business failed.

---

[2] Wells Fargo Bank, as Trustee for Option One Mortgage Loan Trust 2007-5 Asset-Backed Certificates, Series 2007-5 and/or Its Successors filed its Motion for Relief from the Automatic Stay approximately 45 days after the commencement of the Debtors' case. The motion contains a list of the executions and attachments on the property. According to the mortgagee, liens and encumbrances totaled $493,666.74. Liddell objected to the motion, arguing that the trustee would obtain a better price for the property than the mortgagee at a foreclosure sale. The Chapter 7 trustee eventually sold the property in the summer of 2009 for $150,000.

In addition to repairing pianos and giving piano lessons, Peckham served as a City Councilor in Gloucester. He was active in city politics in 2007, but failed to win re-election. He listed a small pension from the City of Gloucester on Schedule B-Personal Property.

With respect to his piano repair business, Peckham, as guarantor, executed a lease with respect to the 72 Rogers Street premises on January 23, 2004. The annual rent was $18,000 for the period between February 1, 2004 and January 31, 2005; $21,000 for the period February 1, 2005 through January 31, 2006, and $24,000 for the period February 1, 2006 through January 31, 2009. Peckham Piano & Music Center, Inc. defaulted under the terms of the lease, and Peckham, as president and guarantor, and the Landlord executed an amendment to the lease on January 31, 2005. Pursuant to the amendment, the Landlord abated the amount in default, namely $6,134.61, and the parties agreed that the annual rent for the lease year commencing February 1, 2005 would be $22,200 and that the annual rent for the lease year commencing February 1, 2006 through January 31, 2009 would be $25,200. Despite the accommodations made by the Landlord, Peckham was not able to make payments under the lease, and on July 6, 2006, he executed an Agreement for Judgment in the sum of $11,538.78, as well as a Judgment for Possession, waiving all rights of appeal. The agreement contained the proviso that the Landlord would hold the judgment, subject to  payment of the July 2006 rent in the sum of $2,100 by July 12, 2006 and the execution of "a promissory note with an open line of credit to pay for any unpaid rent or additional rent, including but not limited to the $11,538.78 owed presently," secured by a second mortgage on the Sumner Street property. The parties further agreed that the first mortgage

4

lien would not exceed $300,000 and that all monies owed would be paid on or before November 1, 2006. As will be discussed below, when Peckham refinanced the couple's property in 2007, the first mortgage lien exceeded $300,000.

Peckham's piano business never generated significant revenues, and the couple's annual gross income never exceeded $40,000. On Schedule C - Profit or Loss from Business (Sole Proprietorship) to the couple's individual federal tax return, Peckham reported a business loss of $87 in 2004; a net profit of $6,265 in 2005; and a net profit of $637 in 2006. In 2007, Peckham did not report any income from his business. Indeed, he disclosed that he was employed as a real estate agent. In 2007, the couple reported annual income of $27,479, an amount less than Liddell's March 9, 2007 judgment in the sum of $27,988.

During the term of the tenancy at Rogers Street, Peckham was struggling to make ends meet due to his inability to use the premises to lacquer or spray paint pianos he had in his possession to repair. Within a few months of relocating to Rogers Street, officials from the City of Gloucester's Fire Department informed Peckham that he could not spray any chemicals or finishes in the building because it lacked a sprinkler system and adequate ventilation. The couple's financial troubles were compounded by the their mounting mortgage debt. The Debtors acquired the Sumner Street property in 2001 and refinanced it multiple times. With property values appreciating, they utilized the property to obtain cash. In June of 2003, the Debtors both executed a mortgage in the sum of $222,300 in favor of H&R Block Mortgage Corporation. Courtney Peckham was the sole signatory on the note, however, and the couple obtained $17,545.66 in cash from the transaction. In the

5

mortgage application which she executed, she untruthfully reported her monthly income from her position as Director of the Essex Ship Building Museum as $7,000.  Courtney Peckham testified that she did not review the mortgage application and relied upon Peckham with respect to the refinancing transaction.

In February of 2004, the couple refinanced the Sumner Street property again, executing a mortgage in the amount of $273,750 in favor of H & R Block Mortgage Corporation.  In that transaction, pursuant to which the couple obtained $14,915.69 in cash, Courtney Peckham was the sole signatory to the note.  In the loan application, she reported her income as $8,000 per month when in fact it was substantially less.

In January 2007, the couple refinanced again, executing a mortgage in favor of Option One Mortgage Corporation in the sum of $336,000.  This time Peckham completed the Uniform Residential Loan Application, reporting that he was self-employed and doing business as Peckham Piano with monthly income of $9,000.  Peckham's statement as to his monthly income was false as he never came close to making $108,000 per year.  Proceeds from the loan were used to pay Option One Mortgage Corporation ($274,217.27), and Alpha Holding Corporation ($51,416.86), and to pay a yield spread premium in the amount of $3,360.  The loan was  based upon a $415,000 valuation of the Debtors' property. Notably, Alpha Holding Corporation was the entity which engineered the transfer of the Debtors' Sumner Street property to "The 66 Sumner Street Trust, Trust No. MA06013" in June of 2006 as part of a foreclosure rescue transaction.  Alpha Holding Corporation, as trustee, deeded the Debtors' property to them in conjunction with the Option One

6

Mortgage Corporation loan.

On July 5, 2002, before the Debtors' financial problems spiraled out of control, Liddell purchased a 1913 Brooks grand piano at the Salvation Army for $200 and reached an agreement with Peckham for its repair.  Liddell did not rebut Peckham's testimony as to the price of the piano at the time Peckham retrieved it from Liddell and brought it to his shop for storage, although the default judgment obtained by Liddell included a valuation of the piano at the time of delivery to Peckham of $3,700.  In July of 2002, Liddell was residing in Gloucester and was attempting to sell his residence.  Peckham picked up the piano from Liddell's residence and agreed to store and repair it for Liddell.  He prepared an estimate for the restoration which set forth the following:

| ITEM | AMOUNT |
|---|---|
| Replacing pin block | $800.00 |
| Restring piano | $1,200.00 |
| Restore action | $200.00-$500.00 |
| Regulation and tunings | $500.00 |
| Case restoration | $1,800.00 |
| Climate control system (optional) | $325.00 |
| **TOTAL** | $4,500-$4,800.00 |
| **With climate control** | $4,825-$5,125.00 |

The estimate also provided the following:

> All moving charges are included in the total price.  Work will proceed with a deposit of $2,250 with the balance paid in installments over a mutually agreeable time period. . . .

7

Liddell paid Peckham in installments for the repair of his piano as follows:

| Dates | Amounts |
|---|---|
| July 5, 2002 | $50.00 |
| December 23, 2003 | $500.00 |
| February 27, 2004 | $200.00 |
| April 29, 2004 | $200.00 |
| May 18, 2004 | $500.00 |
| September 11, 2004 | $1,000.00 |
| August 30, 2005 | $2,000 |
| | |
| Total | $4,450.00 |

Liddell testified that he and Peckham agreed that he would pay for the cost of the restoration with payments over time for labor and materials. Additionally, he indicated that he periodically checked on the condition of the piano, although he was not always able to reach Peckham. Nevertheless, in August of 2005, when Peckham was conducting business on Rogers Street and Liddell had moved to Boston from Gloucester, Liddell met with Peckham to discuss plans to complete the restoration of his piano. Liddell testified as follows:

> I was told at that point that the only thing that remained was the refinishing of the exterior of the piano, that this in fact wouldn't be a problem because he was making and had made arrangements with some friend, some other place in Gloucester to remove the piano so that he could spray paint it which he said he could not do in his current space, with the assurance that all that remained was the box and the promise it would be done and completed, delivered to my apartment by November 1st.

> I listened to this, and then got a rather an emotional plea having to do with financial difficulties, losing his home, et cetera, was induced to pay off the balance of the contract, when I otherwise might not have.

Liddell further testified that, if Peckham had not represented that the work on his piano was substantially complete and that he would deliver the piano by November 1, 2005, he would not have paid him $2,000 on August 30, 2005.

Liddell testified that because Peckham promised delivery of the piano on November 1, 2005 he was awaiting its arrival on that date. Peckham did not deliver the piano on that date. Liddell attempted to contact Peckham but could not reach him. Thereafter, communication became increasingly difficult. When he was able to reach Peckham, Liddell stated " . . . I had [sic] the same litany of things that had put me off repeatedly, about politics and financial difficulties and the business about the inappropriate space he was in . . . ." Liddell and Peckham subsequently reached a new agreement whereby Peckham would deliver the piano on July 3, 2006. Indeed, Peckham represented to Liddell that he had hired a truck and "everything was a go," even though Liddell had not paid the full amount of the estimate.

Although Liddell anticipated that the piano would be the centerpiece of his Fourth of July party, he was distressed to receive, on July 2, 2006, a voice message on his answering machine from Peckham advising him that he could not deliver the piano on July 3, 2006. Peckham promised another delivery date, but again he failed to deliver the piano. Liddell later received an email from Peckham on July 17, 2006 in which Peckham stated: "Hello Ray, Sorry for the delay. I am sending these [sic] from my home computer. I will call you later today so we can discuss delivery." Peckham never called.

In January of 2007, Liddell obtained access to Peckham's former business premises

9

at 72 Rogers Street.  He located his piano in a locked space in the shop and observed its condition.  He testified that it was in poor condition.

> I found my piano, but it was disassembled.  It was still on its feet, but the top was gone, the entire keyboard assembly which slides in to the front of the piano was gone.  I couldn't locate it, couldn't identify anything.  Obviously the pedal assembly was gone.

Liddell returned to 72 Rogers Street with a camera and a piano restorer from Boston by the name of James Micaloro [sic].  He indicated that superficial work had been done to the piano.  The strings had been replaced after the box itself had been cleaned out and the metal armature inside had been painted.  The keyboard assembly was missing, however, and the old pin block had not been replaced as specified in the contract.  Based upon the condition of the piano, Liddell decided to abandon it as he did not wish to incur additional expenses associated with moving the piano and completing the restoration.

Peckham testified that he did a considerable amount of work on the piano and the only thing left to do was to spray paint it.  He indicated that he had new key tops made for the piano, that the strings were back in place and labeled, that the sound board or pin block had been repaired, and that the piano had been stripped and sanded.  Indeed, he stated that it was 99% restored.

Liddell's piano was not the only piano that Peckham failed to restore within the time promised.  Virginia Bergmann ("Bergmann"), a retired nurse and vice-chair of the Gloucester Zoning Board of Appeals, testified that in June of 2005 she employed Peckham to repair a baby grand piano that had been a gift to her from her deceased husband.

According to Bergmann, Peckham estimated that it would cost $5,000 to restore the piano. She testified that she made an initial deposit of $1,000 and the following month gave Peckham a check in the amount of $2,000. Peckham represented to her at the time that the repairs were "coming along." In November, Peckham called Bergmann requesting the balance due of $2,000. Bergmann testified: "[H]is reference was not to the piano so much but he said to me that he was in dire need, short of money and needed to make a house payment." She added: "[Because] it was the holiday season, I felt really bad for the gentleman and I gave him the $2,000 which paid up my bill to him for my piano."

Bergmann attempted to contact Peckham numerous times. She stated that he told her on a number of occasions that he had hired movers to deliver the piano, but he failed to perform. Finally, Bergmann engaged an attorney and was able to recover her piano from the Rogers Street location two days before Christmas in 2006. Bergmann testified that the piano was in the same condition that it was in when Peckham obtained it for purposes of repairing it, although it had been dismantled. She engaged another piano restorer who charged her $6,900 to renovate her piano. She commenced an action against Peckham and recovered a judgment in the sum of $23,000.

At the commencement of his Chapter 7 case, Peckham had a number of pianos in his possession that had been delivered to him for repairs. Indeed, he lost contact with one customer whose piano he was engaged to repair.

Like Bergmann, Liddell commenced an action against Peckham preceded by a demand letter dated August 2, 2006. In the letter, which was prepared by Liddell's

11

attorney, Harvey S. Shapiro, Esq. ("Attorney Shapiro"), and sent by certified mail, return receipt requested, Attorney Shapiro stated: "Should you fail to promptly return the piano as requested, you should appreciate that you will increase the likelihood that you will be subject to treble damage remedies under the State Consumer Protection Act, as well as incur liability for Mr. Liddell's costs and attorneys [sic] fees."  Attorney Shapiro followed that letter with another letter, dated August 23, 2006, enclosing the certified letter and again demanding the return of Liddell's piano.

On October 18, 2006, Attorney Shapiro sent a demand letter to Peckham under Mass. Gen. Laws ch. 93A, again advising him as follows: "Failure to make a proper written tender of relief within (3) days of receipt of this demand shall result in suit for treble damages, costs and attorney's fees. You should, accordingly, promptly consult with counsel." Attorney Shapiro asserted that Peckham breached his agreement with Liddell and converted the piano.  He demanded the return of the $4,450 paid by Liddell to Peckham with interest at the rate of 6% from July 2002, as well as $3,700 to replace Liddell's piano with a piano of the same type and condition as the Brooks baby grand, and $800 for loss of use of the piano.

In December of 2006, Liddell filed a four-count complaint against Peckham and Peckham Piano & Music Center, Inc. in the Cambridge District Court setting forth the following causes of action: "Breach of Contract/Rescission/Equitable Replevin;" "Conversion;" "Conversion/Loss of Use;" and "Massachusetts Consumer Protection Act." He did not seek a pre-judgment attachment. The Essex Count Sheriff's Department served

the summons and complaint on Peckham on January 4, 2007.  Peckham failed to answer

the complaint or otherwise defend.  Liddell recovered a judgment on March 9, 2007 in the

sum of $27,988.74, including prejudgment interest in the sum of $691.04.

Following receipt of the judgment, Attorney Shapiro immediately undertook steps

to collect it.  On March 23, 2007, he sent Peckham a letter by certified mail, return receipt

requested, and by first class mail, enclosing "Plaintiff's First Notice to Produce Documents

Propounded to Defendant Walter G. Peckham Pursuant to M.R.C.P. 69;"[3]  Plaintiff's First

Set of Interrogatories Propounded to Defendant Walter G. Peckham Pursuant to M.R.C.P.

Rule 69; and a "Notice of Service Of Discovery Pursuant To Mass. R. Civ. Pro. Rule 69."

Attorney Shapiro warned Peckham that Liddell intended to collect the judgment  and that

his failure to respond would result in Liddell seeking "further orders from the Court."

Additionally, he advised Peckham that "we will ask the Court for supplemental awards

of attorney's fees for our efforts to collect the judgment," adding "[i]t is, accordingly, not

in your interest to force my client to expend unnecessary efforts in order to recover on the

judgment."  He concluded his letter to Peckham with the following advice: "You should

---

[3] Mass. R. Civ. P. 69 provides:

Process to enforce a judgment for the payment of money shall be a writ of
execution, unless the court directs otherwise. The procedure on execution,
in proceedings on and in aid of execution shall be in accordance with
applicable statutes. In aid of the judgment or execution, the judgment
creditor or his successor in interest when that interest appears of record,
may obtain discovery from any person, including the judgment debtor, in
the manner provided in these rules.

13

take this matter very seriously and consult counsel promptly."

Peckham eventually consulted an attorney and, on or around April 27, 2007, filed a "Motion for Relief from Judgment under Rule 60(b) of the Massachusetts Rules of Civil Procedure."  The district court denied the motion.

On May 16, 2007, Liddell filed a "Motion to Compel Discovery in Aid of Judgment or Execution and to Award Attorney's Fees Against Defendant Walter G. Peckham" in which Attorney Shapiro requested fees in the sum of $425. The matter was scheduled to be heard on May 30, 2007.  Peckham failed to appear at the hearing, and the court granted the Motion to Compel.  In a letter dated June 4, 2007 to Peckham's attorney, Attorney Shapiro advised that he would "move for additional sanctions and a capias if the Debtor failed to produce the requested discovery or pay his fee of $425 by July 2, 2007.

On July 16, 2007, having failed to hear from Peckham's attorney, Attorney Shapiro filed a "Motion for Order to Show Cause under Mass. R. Civ. P. 37(b)(2)(D)," in which he asked the Court to issue an order to show cause why Peckham should not be held in contempt of the May 30, 2007 order and to issue a capias for Peckham's arrest in the event he failed to respond to a Notice to Show Cause.

The Cambridge District Court granted Liddell's Motion on August 1, 2007 and issued an order to Peckham to appear on August 29, 2007 at 9:00 A.M. "to show cause, if any you have, why said Order has not been complied with and why you should not be punished for such contempt."  The contempt hearing was rescheduled from August 29, 2007 to September 7, 2007 on which date the Cambridge District Court entered a "Further

14

Order Upon Motion for Order to Show Cause." The Cambridge District Court imposed additional sanctions "[a]s punishment" for Peckham's contempt, including the payment to Liddell of additional attorney's fees and costs in the sum of $1,556.50 (i.e., in addition to the $425 previously assessed) and an assessment of $75 *per diem* "for each day, commencing ten (10) days from the date of this Order, until he has responded *fully and completely* to the discovery served in this case . . . and all objections thereto being deemed waived." Additionally, the court authorized the issuance of a capias on September 30, 2007, for Peckham's arrest, unless he had by that date filed with the court and served Attorney Shapiro an affidavit attesting to his payment of the $1,981.50 and any *per diem* required by the order and full and complete responses to all discovery. The Court made no specific findings that Peckham's conduct was willful or malicious or was intended to harm Liddell.

Peckham failed to comply with the Cambridge District Court's order, and, on October 19, 2007, a capias issued for his arrest. In February of 2008, Peckham's attorney advised Attorney Shapiro that his client intended to file a bankruptcy petition. Accordingly, the deputy sheriff returned the capias to Attorney Shapiro. As of June 10, 2008, however, Peckham had not commenced a bankruptcy case, and on June 11, 2008, the Essex County Deputy Sheriff arrested him and brought him to the Cambridge District Court were he was ordered to jail. Peckham and his spouse filed their Chapter 7 petition the next day.

Peckham, when questioned about his financial problems, became emotional on the witness stand. When testifying about why he failed to respond to Attorney Shapiro's

demand letters, Liddell's complaint filed in the Cambridge District Court, the discovery

in aid of execution, and the contempt order, he stated that he could not afford an attorney,

and he described his life after his eviction from the Rogers Street location in January 2007

as "[h]orrible."  He added:

> Well, after the stress of being evicted, and also losing my seat on the City
> Council, I went into deep, deep severe depression.  I have been seeking the
> help of a psychiatrist . . . in Gloucester, going to psychotherapists . . . . They
> have put me on several anti-depressants, anxiety pills.  And I have not been
> able - - I have applied for over fifty jobs but I have not been able to get one.
>
> ***
>
> Our world fell apart.  We have nothing.

Although Peckham continued to attend City Council hearings and to advocate for

his constituents in 2007 while Liddell was attempting to collect his default judgment, the

Court credits Peckham's testimony about his depression.  While Peckham was less than

forthright in his dealings with Liddell and Bergmann, and careless at best in executing his

mortgage loan application and facilitating his spouse's execution of loan applications, the

Court finds that his financial circumstances were dire, that the lease provisions for the

Rogers Street premises were onerous, and that his inability to lacquer pianos at Rogers

Street was fatal to his business.  Furthermore, Peckham and his spouse were so desperate

to save their home that they transferred it to Alpha Holding Corporation in a foreclosure

rescue transaction that ultimately cost them significant monies to effectuate the transfer of

the property back into their names.  Peckham's  financial world was indeed falling apart,

and, in view of his age and lack of a college degree, his circumstances were such that his

16

testimony about anxiety and depression was credible. Whether his mental state is sufficient to excuse his conduct is at the center of the dispute between the parties. The Court cannot discount his plight and finds that like so many debtors he lacked the ability and resources to change his circumstances, and by default resorted to chicanery and avoidance to keep the inevitable at bay.

## III. POSITIONS OF THE PARTIES

### A. The Plaintiff

Liddell seeks a determination that at least a portion of the Cambridge District Court's judgment is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Additionally, he seeks a determination that Peckham's conduct in the post-judgment proceedings was a willful and malicious injury, and therefore, nondischargeable under 11 U.S.C. § 523(a)(6).[4]

### B. Peckham

The Debtor maintains the underlying dispute is a contract dispute and that he made no false or fraudulent misrepresentations. Additionally, he maintains that his actions toward Liddell were not willful and malicious, particularly as he engaged in no tortious conduct.

---

[4] Specifically, Liddell formulated five counts in his complaint as follows: A. Debt for Money and Property Obtained by False Pretenses, False Representations, or Actual Fraud (11 U.S.C. § 523(a)(2)(A)) ($2,000 of the Original $4,450.00 Deposit); B. Debt for Money and Property Obtained by False Pretenses, False Representations, or Actual Fraud (11 U.S.C. § 523(a)(2)(A)) (Entire Obligation); C. Willful and Malicious Injury (11 U.S.C. § 523(a)(6)) (Entire Obligation); D. Willful and Malicious Injury (11 U.S.C. § 523(a)(6)) (Piano); and E. Willful and Malicious Injury (Post-Judgment Proceedings) (11 U.S.C. § 523(a)(6)).

## IV. DISCUSSION

For purposes of the following discussion, the Court shall consolidate Liddell's two counts under § 523(a)(2)(A) and three counts under §523(a)(6). Except with respect to the post-judgment proceedings, this Court finds that Liddell submitted no evidence to sustain his claims that Peckham willfully and maliciously intended to injure him or his piano.

A. Section 523(a)(2)(A)

1. Applicable Law

Section 523(a)(2)(A) excepts from discharge a debt of an individual debtor "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by-(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). The plaintiff must establish that the debt is excepted from discharge by a preponderance of the evidence. *See* Grogan v. Garner, 498 U.S. 279, 291 (1991).

In Blacksmith Investments, LLC v. Woodford (In re Woodford), 403 B.R. 177 (Bankr. D. Mass. 2009), *aff'd*, 418 B.R. 644 (B.A.P. 1st Cir. 2009), this Court stated:

> The United States Court of Appeals for the First Circuit has addressed issues under section 523(a)(2)(A) on multiple occasions, observing that, as with all exceptions to discharge under section 523(a), they are "narrowly construed . . . and the claimant must show that its claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a)." McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 (1st Cir. 2001) (citing Century 21 Balfour Real Estate v. Menna (In re Menna), 16 F.3d 7, 9 (1st Cir. 1994)). In Spigel, the First Circuit, while noting that the Supreme Court overruled its formulation of the reliance element of the test for nondischargeability under section 523(a)(2)(A), articulated the following requirements for establishing an exception to discharge under section 523(a)(2)(A):

18

[W]e have said that the statutory language does not "remotely suggest that nondischargeability attaches to any claim other than one which arises as a direct result of the debtor's misrepresentations or malice." <u>Century 21 Balfour Real Estate</u>, 16 F.3d at 10. Thus, in order to establish that a debt is nondischargeable because obtained by "false pretenses, a false representation, or actual fraud," we have held that a creditor must show that 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the misrepresentation, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage. <u>Palmacci v. Umpierrez</u>, 121 F.3d 781, 786 (1st Cir. 1997). Though the first two elements of the <u>Palmacci</u> test describe the conduct and scienter required to show fraudulent conduct generally, the last four embody the requirement that the claim of the creditor arguing nondischargeability in an adversary proceeding must arise as a direct result of the debtor's fraud.

<u>Spigel</u>, 260 F.3d at 32 (footnotes omitted).

<u>In re Woodford</u>, 403 B.R. at 183-84 (footnote omitted).

In <u>Youssef v. Fogarty (In re Fogarty)</u>, No. 08-1112, 2010 WL 916818 (Bankr. D. Mass. Mar. 10, 2010), this Court discussed <u>McClellan v. Cantrell</u>, 217 F.3d 890 (7th Cir. 2000), and its progeny, in which courts hold that "actual fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions. . . . [w]hen a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right . . . ." *See* <u>Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)</u>, 259 B.R. 873, 877 (B.A.P. 6th Cir.2001)); <u>K-B Building Co. v. Barber (In re Barber)</u>, 281 B.R. 617, 624 (Bankr. W.D. Pa. 2002); and <u>Gentry v. Kovler (In re Kovler)</u>, 249 B.R. 238, 260-61 (Bankr. S.D.N.Y. 2000). This

19

Court stated:

> While the First Circuit has focused its test on the "false representation" component of section 523(a)(2)(A), and the Seventh Circuit formulated a different approach for the "actual fraud" component, other courts have fashioned a slightly different test for the "false pretenses" component. For example, in <u>Ostertag v. Overall (In re Overall)</u>, 248 B.R. 146 (Bankr. W.D. Mo. 2000), the court observed:
>
> > The concept of false pretenses is especially broad. It includes any intentional fraud or deceit practiced by whatever method in whatever manner. False pretenses "may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak, and may consist of any acts intended to deceive." Black's Law Dictionary 602 (6th ed.1990). It is a "series of events, activities, or communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding of a transaction, by which a creditor is wrongly induced by a debtor to transfer property or extend credit to the debtor." <u>Sterna v. Paneras (In re Paneras)</u>, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996). Silence or concealment as to a material fact can constitute false pretenses. <u>Bank of Miami v. Quintana (In re Quintana)</u>, 4 B.R. 508, 510 (Bankr. S.D. Fla. 1980). In short, false pretenses "can be made in any of the ways in which ideas can be communicated." <u>First Nat. Bank of Webster v. Aetna Cas. & Sur. Co.</u>, 256 F.Supp. 266, 272 (D. Mass. 1966).
>
> <u>In re Overall</u>, 248 B.R. at 150 (footnote omitted).

<u>In re Fogarty</u>, 2010 WL 916818 at *7-*8.

2. Analysis

The Court finds that the Plaintiff has satisfied his burden under section 523(a)(2)(A) by a preponderance of the evidence with respect to the $2,000 payment made by Liddell to Peckham on August 30, 2005. Liddell testified that Peckham represented to him at the time of that payment that the restoration of his piano was substantially complete.

20

According to Liddell, Peckham represented that the only thing that remained to be done to fully restore the piano was the refinishing of the exterior, that he had made arrangements to move the piano from the Rogers Street location so that it could be spray painted elsewhere, and that he would deliver the piano to him by November 1, 2005. The Court finds that Peckham falsely represented that he had substantially completed the restoration of the piano in accordance with the estimate he prepared. Liddell testified based upon his observations that the items set forth in the estimate prepared by Peckham had not been performed, including replacement of the pin block. Moreover, full restoration required that the piano be moved, lacquered, reassembled and delivered to Liddell. The Court finds that Peckham made the representations that the repairs to the piano were substantially completed and that the piano would be delivered on November 1, 2005 with knowledge of their falsity or with reckless disregard for their truth. The Court also finds that Peckham intended for Liddell to rely on his representations, and Liddell, in fact, justifiably relied on those representations to his detriment.

Peckham's inability to utilize the Rogers Street premises to spray paint pianos, his dire and worsening financial condition, and his conduct in repeatedly promising to deliver Liddell's piano to him in 2005 and 2006, as well as his conduct with respect to Bergmann, unequivocally support the conclusion that Peckham falsely represented to Liddell that he intended to complete the restoration of the piano in August of 2005 and deliver it to Liddell in Boston on November 1, 2005. At the time, Peckham lacked a facility in which to lacquer Liddell's piano and the income to pay movers to transport it from Rogers Street to another

location and then to Liddell's home in Boston.  The Debtor's annualized monthly rental
obligation to the Landlord of $1,880 per month in 2005 and the couple's annualized
monthly mortgage obligations, including the payment of real estate taxes and insurance
of approximately $2,000, exceeded the couple's reported income of $37,465 in 2005 by over
$8,000.  Peckham simply did not have the ability to fulfill his obligations to Liddell and he
knew it.  He expressed his distress about his financial circumstances to both Liddell and
Bergmann and pleaded with them for money.

Although Peckham obtained $2,000 from Liddell by means of false representations,
he did not obtain the initial payments from Liddell, totaling $2,250, by means of false
pretenses or false representations.  The Court finds that at the commencement of the
parties' contractual relationship, Peckham intended to restore Liddell's piano, and he, in
fact, performed some of the promised repairs.  Indeed, the photograph submitted into
evidence by Liddell shows that Peckham had sanded the surface of the piano in
preparation for its final refinishing.  Thus, the only money that Peckham obtained from
Liddell by means of false pretenses or false misrepresentations that constitutes a
nondischargeable debt under 11 U.S.C. § 523(a)(2)(A) is the $2,000 payment made in
August of 2005.

Liddell, however, argued that "[w]hile the money actually obtained through
Peckham's deceit was $2,000.00, *the debt arising therefrom* is something else."  He seeks
$6,000 ($2,000 trebled), plus attorney's fees and costs because the Cambridge District Court
trebled the damages and awarded attorney's fees in entering its $27,988 judgment on

March 9, 2007.  The Court rejects this argument for two reasons.  In the first place, Liddell did not set forth a claim for fraud under Massachusetts law in the district court action, and Cohen v. de la Cruz, 523 U.S. 213 (1998), is distinguishable.

In De la Cruz v. Cohen (In re Cohen), 185 B.R. 180 (Bankr. D. N.J. 1995), aff'd, 191 B.R. 599 (D. N.J. 1996), aff'd, 106 F.3d 52 (3d Cir. 1997), aff'd, 523 U.S. 213 (1998), the award of treble damages was not based upon a default judgment, and the plaintiffs requested treble damages and reasonable attorneys' fees in the complaint they filed in the bankruptcy court.  185 B.R. at 182 and n.2.  The bankruptcy court referenced the "written record of the Hoboken Rent Leveling Board" and conducted a hearing to determine the amount of damages, finding that the debtor violated the provisions of New Jersey's Consumer Fraud Act.

In the instant case, Liddell did not bring a separate count under Mass. Gen. Laws ch. 93A, and, for the reasons set forth below, the Cambridge District Court judgment was a default judgment which is not entitled to collateral estoppel effect.  Accordingly, the Court is not bound by the damages set forth in the judgment reflected in Liddell's claim for triple damages under Mass. Gen. Laws ch. 93A.  Moreover, although Liddell elected to abandon the piano rather than move it to another location to complete its restoration, Liddell's piano was not worthless when he photographed it in January of 2007.  Indeed, in the Cambridge District Court action, he set forth a claim for its value in the amount of $3,700 before Peckham made some repairs to it.  Nevertheless, the Court accepts Peckham's unrebutted testimony that Liddell paid very little money for the piano, and that even in its

23

unfinished condition it was worth at least $2,250.[5]  If, as Liddell represented in his state

court complaint that it was worth $3,700 in July 2002 when he delivered it to Peckham, and

Peckham performed some work on the piano, the Court can infer that it was not worthless,

even though Liddell testified that he was unable to find various parts for the piano at the

Rogers Street location and decided to abandon it.

In <u>Backlund v. Stanley-Snow (In re Stanley-Snow)</u>, 405 B.R. 11 (B.A.P. 1st Cir. 2009),

the United States Bankruptcy Appellate Panel for the First Circuit discussed when a state

court default judgment may be entitled to collateral estoppel effect in an action under 11

U.S.C. § 523(a)(2)(A).  It stated:

> In determining whether a party should be estopped from relitigating an issue
> decided in a prior state court action, the bankruptcy court must look to that
> state's law of collateral estoppel. *See* <u>Spigel</u>, 260 F.3d at 33 (citing <u>New
> Hampshire Motor Transp. Ass'n v. Town of Plaistow</u>, 67 F.3d 326, 328 (1st
> Cir. 1995)); *see also* <u>Marrese v. American Academy of Orthopaedic Surgeons</u>,
> 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985) (stating that the full faith
> and credit statute, 28 U.S.C. § 1738, "directs a federal court to refer to the
> preclusion law of the State in which the judgment was rendered."). Under
> Massachusetts law, collateral estoppel precludes relitigation of issues in prior
> actions between the parties or those in privity with those parties, provided
> the issues were actually litigated in the first action, and determined by a
> "final judgment on the merits." <u>Smith Barney, Inc. v. Strangie (In re Strangie)</u>,
> 192 F.3d 192, 194 (1st Cir. 1999). To apply the doctrine, a court must
> determine that: (1) there was a valid and final judgment on the merits in the
> prior adjudication; (2) the party against whom estoppel is asserted was a
> party (or in privity with a party) to the prior litigation; (3) the issue in the
> prior adjudication is identical to the issue in the current litigation; and (4) the
> issue in the prior litigation was essential to the earlier judgment. <u>Alba v.
> Raytheon Co.</u>, 441 Mass. 836, 809 N.E.2d 516, 521 (2004) (citations omitted).

---

[5] Liddell did not testify about what he paid for the piano or what he thought it
was worth when he bought it.  His attorney did not call him to the witness stand to
rebut Peckham's testimony that the piano was purchased at the Salvation Army.

The Supreme Judicial Court of Massachusetts has noted that "the 'guiding principle' in determining whether to allow a party to use collateral estoppel is whether the party against whom it is asserted had a 'full and fair opportunity to litigate the issue in the first action or [whether] other circumstances justify affording him an opportunity to relitigate the issue.' " Treglia v. MacDonald, 430 Mass. 237, 717 N.E.2d 249, 253 (1999) (quoting Martin v. Ring, 401 Mass. 59, 514 N.E.2d 663 (1987)).

In re Stanley-Snow, 405 B.R. at 18.  The bankruptcy appellate panel further observed that "[i]n Massachusetts . . . default judgments are generally not given collateral estoppel effect on an issue in a subsequent action because the issues have not been actually litigated." Id. at 19 (citing Treglia, 717 N.E.2d at 253; Staniunas v. Delisle (In re Delisle), 281 B.R. 457, 463 (Bankr. D. Mass. 2002); Phalon v. Varrasso (In re Varrasso), 194 B.R. 537, 539 (Bankr. D. Mass. 1996); Restatement (Second) of Judgments § 27 cmt. e (1982) (in the case of a judgment entered by default, none of the issues is actually litigated, therefore, the judgment should not have preclusive effect)).[6] See also Sharfarz v. Goguen (In re Goguen), No. 09-4158, 2010 WL 2612662 (Bankr. D. Mass. June 25, 2010); Rivers Edge Condominium Homeowners Assoc. v. Cohen (In re Cohen), 370 B.R. 26, 29  (Bankr. D. N.H. 2007) ("There is a 'strong presumption' against according collateral estoppel preclusive effect to default judgments, and the presumption will only be rebutted upon a finding  'that a party's reasons for not litigating are such that the interests of fairness militate against the non-preclusion of issues already raised but not litigated'"); See also Kane v. Town of Harpswell (In re Kane), 254 F.3d 325, 329 (1st Cir. 2001) (identifying default judgments as

---

[6]  The court noted an exception, however, finding that the "actual litigation" requirement of collateral estoppel may be satisfied if the party actively or substantially participated in the proceedings prior to the entry of a default judgment.  Id. at 19-20.

25

examples of matters not "actually litigated").

Based upon the foregoing statements of the law, the Court finds that Liddell is not entitled to a determination that Peckham obtained more than $2,000 from him by means of false pretenses or false representations.  Peckham testified that he was unable to afford an attorney to defend the litigation in the Cambridge District Court, and he did not participate in the action until after the entry of the judgment when he filed a Motion for Relief from Judgment.  He did not actively participate in the case, and Liddell failed to establish an exception to the general rules that "Chapter 93A violations and fraud are not synonymous, and that Chapter 93A liability may be premised on conduct other than fraud." *See* Stoehr v. Mohamed, 244 F.3d 206, 209 (1st Cir. 2001).  Additionally, Liddell failed to establish an exception to the general rule that default judgments are not entitled to collateral estoppel effect.  Thus, the Court rejects Liddell's argument that his $2,000 in damages should be trebled and include attorney's fees for purposes of determining the amount of his nondischargeable debt under section 523(a)(2)(A).

    B. Section 523(a)(6)

        1. Applicable Law

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).  As under 11 U.S.C. § 523(a)(2), the Plaintiff bears the burden of proving that his claim under § 523(a)(6) by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 287 (1991).

In Kawaauhau v. Geiger, 523 U.S. 57 (1998), the Supreme Court analyzed the

26

"willful" component of section 523(a)(6). It stated:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences* of an act," not simply "the act itself." Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964) (emphasis added).

523 U.S. at 61-62.

As a result of the Supreme Court's decision, actions of the debtor which simply cause injury, but which are not deliberately undertaken, are not excepted from discharge. Because the Supreme Court found that the defendant's medical malpractice did not rise to the level of willful injury, the Court did not reach the question of what the term "malicious" added to the analysis. Id.

The United States Court of Appeals for the First Circuit in Printy v. Dean Witter Reynolds, Inc., 110 F.3d 853 (1st Cir.1997), held that the element of malice in section 523(a)(6) requires that the creditor show that the willful injury was caused without justification or excuse, adding that "personal hatred, spite or ill-will" need not be established to find the element of malice. Id. at 859. The Printy formulation is followed by bankruptcy courts in this circuit. *See, e.g.,* Bauer v. Colokathis, 417 B.R. 150, 158 (Bankr. D. Mass. 2009)(citing Caci v. Brink (In re Brink), 333 B.R. 560, 567 (Bankr. D. Mass. 2005);

Gomes v. Limieux (In re Limieux), 306 B.R. 433, 440 (Bankr. D. Mass. 2004); and McAlister

v. Slosberg (In re Slosberg), 225 B.R. 9, 21 (Bankr. D. Maine 1998)).  *See also* Hermosilla v.

Hermosilla (In re Hermosilla), 430 B.R. 13, 22 (Bankr. D. Mass. 2010).

> In Colokathis, this Court stated:

> Construing Geiger and Printy, together this Court concludes that, for an
> exception to discharge under 11 U.S.C. § 523(a)(6) to apply, the creditor has
> the burden of showing . . . that 1) the creditor suffered injury; 2) the debtor
> intended to cause the injury or that there was substantial certainty that the
> injury would occur; and 3) the debtor had no justification or excuse for the
> action resulting in injury. This is consistent with the Slosberg court's view
> that although "the terms [willful and malicious] might share elements, i.e.,
> they both require that the act itself be intentional, they must have
> independent significance. In re Geiger should not be read to collapse the two
> elements into one." Slosberg, 225 B.R. at 19-20 (citations omitted).

Colokathis, 417 B.R. at 157-58.  *See also* Hermosilla v. Hermosilla (In re Hermosilla), 430 B.R.

13, 22 (Bankr. D. Mass. 2010).

Despite the interpretation of malice in the First Circuit and elsewhere, the law

remains unsettled.  For example, in  GMAC, Inc. v. Coley (In re Coley), No. 09-0307, 2010

WL 2991416 (Bankr. E.D. Pa. July 29, 2010), the court stated:

> Courts also have invoked different standards for determining whether an
> intentional tort involved "malice" within the meaning of § 523(a)(6). For
> example in In re Long, 774 F.2d 875, 881 (8th Cir. 1985), the court reasoned
> that, for the debt for any injury arising from an intentional tort to be
> nondischargeable under § 523(a)(6), the debtor's conduct must be "more
> culpable than that which is in reckless disregard of creditors' economic
> interests and expectancies." Further, in assessing the debtor's culpability,
> "knowledge that legal rights are being violated is insufficient to establish
> malice, absent some additional 'aggravated circumstances'. . . ." Id. Other
> courts, too, have stated that the existence of "aggravating circumstances" and
> a conscious disregard of one's societal duties to others are essential aspects
> of the malice requirement under § 523(a)(6). *See, e.g.*, In re Logue, 294 B.R. 59,

28

63 (B.A.P. 8th Cir. 2003); <u>In re Richardson</u>, 2007 WL 2381990, at *6-7 (Bankr.
N.D. Ala.  Aug.17, 2007); <u>In re Weiser</u>, 2007 WL 4868319, at *2 (Bankr. N.D.
Ind. Apr. 4, 2007); <u>In re Hambley</u>, 329 B.R. 382, 402 (Bankr. E.D.N.Y. 2005); <u>In
re Blankfort</u>, 217 B.R. 138, 143-45 (Bankr. S.D.N.Y. 1998).

In this unsettled area of the law, one court has summarized the differing
standards for malice as follows:

> One standard requires proof from the creditor that the debtor
> acted with the specific intent to injure the creditor. A second
> view is that the creditor need only prove that the debtor acted
> without just cause or excuse. A third approach requires that
> the debtor's conduct target the creditor, at least in the sense
> that the conduct was certain or almost certain to cause financial
> harm. A fourth approach, which has been characterized as a
> "totality of the circumstances" approach, adopts the position
> that an injury is malicious if the debtor *fails to act in subjective
> good faith.*

<u>In re Pineau</u>, 149 B.R. 239, 242 (D. Me.1993) (emphasis added) (citing <u>In re
Horldt</u>, 86 B.R. 823 (Bankr. E.D.Pa.1988)).

<u>In re Coley</u>, 2010 WL 2991416 at *13.[7]

In the context of a nondischargeability action under § 532(a)(6) involving contempt,

the court in <u>Musilli v. Droomers (In re Musilli)</u>, No. 08-2572, 2010 WL 2222806 (6th Cir. Jun

3, 2010), observed: "[f]or the discharge exception under § 523(a)(6) to apply, a debtor must:

(1) 'will or desire harm[;]' or (2) 'believe injury is substantially certain to occur as a result

of his behavior.'" 2010 WL 2222806 at *4 (citing <u>Markowitz v. Campbell (In re Markowitz)</u>,

190 F.3d 455, 465 n. 10 (6th Cir. 1999)).  The <u>Musilli</u> court added: "This court has created a

non-exclusive list of the 'types of misconduct [that] satisfy the willful and malicious injury

_____

[7] Litigation under section 523(a)(6) for willful and malicious injuries often arises
in the context of conversion of collateral, resulting in courts' focusing on harm to
creditors' economic interests.

standard: intentional infliction of emotional distress, malicious prosecution, conversion, assault, false arrest, intentional libel, and deliberately vandalizing the creditor's premises.'" 2010 WL 2222806 at *4 (citing Steier v. Best (In re Best ), 109 F. App'x. 1, 5 & n. 2 (6th Cir.2004)).  In Musilli, the Sixth Circuit affirmed the bankruptcy court's determination that the debtor and his law partner willfully and maliciously harmed the plaintiff when they violated a court order to escrow funds sufficient to cover a judgment against the law firm. Specifically, the plaintiff, who claimed entitlement to a referral fee, asserted that because the firm had violated the Uniform Fraudulent Transfer Act by failing to set aside a referral fee during litigation and instead transferred the money to shareholders, it would be difficult or impossible to collect on the fee.   The plaintiff asked the court to require the firm to place the claimed funds in escrow pending resolution of the suit.  The court granted the plaintiff's motion and enjoined the firm from transferring any firm assets until it placed the disputed sum in escrow. The firm never escrowed the funds, and transferred money to its shareholders, including the debtors, without obtaining court permission.  After a bench trial, in which the state court entered a judgment in favor of the plaintiff, the state court held the firm in contempt.  After a lengthy and complex procedural history in which the debtors violated an agreement with the plaintiff and sued her for extortion, they filed bankruptcy petitions.  The bankruptcy court eventually determined that the state court's criminal contempt award was nondischargeable.  In affirming, the Sixth Circuit  stated:

> We find that the court's escrow order made clear that "injury [wa]s substantially certain to occur" should Musilli and Baumgardner [the debtors] violate it. In re Markowitz, 190 F.3d at 465 n. 10. Musilli and Baumgardner

30

point to no facts in the record that refute this finding. Despite having clear
instructions from the court that the firm was to escrow funds sufficient to
cover a judgment against it, Musilli and Baumgardner transferred all of the
firm's assets away from the firm, including transferring a significant amount
of money to themselves. The appellants directly violated the court order and
have offered no legitimate justification that might explain why their actions
were not willful and malicious. Therefore, we affirm the bankruptcy courts
grant of summary judgment for Droomers [the plaintiff] on her claim that the
debt is nondischargeable under § 523(a)(6).

In re Musilli, 2010 WL 2222806 at *5.  In support of its decision, the Sixth Circuit observed:

Other courts uniformly have held that a contempt penalty constitutes a
nondischargeable willful-and-malicious injury under § 523(a)(6). *See, e.g.,*
Siemer v. Nangle (In re Nangle), 274 F.3d 481, 484 (8th Cir. 2001) (finding that
a debtor's conduct in disobeying a court order was "willful," and his
"conduct was malicious because it was 'targeted at the creditor. . . at least in
the sense that the conduct is certain or almost certain to cause . . . harm.'"
(quoting Barclays American/Business Credit, Inc. v. Long (In re Long), 774
F.2d 875, 881 (8th Cir. 1985))); Williams v. Int'l Brotherhood of Elec. Workers
Local 520 ( In re Williams), 337 F.3d 504, 511-13 (5th Cir.2003) (holding that
a contempt judgment resulting from the debtor's violation of an agreed
judgment was nondischargeable under § 523(a)(6) because the judgment had
"made him substantially certain that his acts would inflict injury" should he
not comply with its directives).

2010 WL 222806 at *5.

The Court finds that the Musilli decision and the cases cited in it are distinguishable
from the facts present in the instant case, and they highlight divergent views of what is
required to establish a willful and malicious injury for purposes of § 523(a)(6).  As the court
in Suarez v. Barrett (In re Suarez), 400 B.R. 732, 736-37 (B.A.P. 9th Cir. 2009), recognized,
"Section 523(a)(6) does not make "contempt" sanctions nondischargeable *per se*, and neither
does any other subpart of section 523(a)."  400 B.R. at 737.  It added: "Whether contempt
sanctions are nondischargeable accordingly depends not on whether they are labeled as

31

"contempt," but on whether the conduct leading to them was "willful and malicious." Id.[8]

In In re Nangle, a decision cited by the court in Musilli, a jury awarded the plaintiff punitive damages as a result of the debtor's willful and wanton conduct, which the trial judge defined as "'a course of action which shows actual or deliberate intention to harm or which, if not intentional, shows an utter indifference to or conscious disregard of a person's own safety and the safety of others.'" 274 F.3d at 483.  In Nangle, the plaintiff registered her Illinois judgment as a foreign judgment in Missouri and attempted to collect the judgment by filing a motion to compel the debtor to produce documents disclosing his assets.  The state court held the debtor in contempt when he failed to comply with the order and imposed a "compensatory fine" against him, which the parties referred to as a doubling of the underlying judgment.  Id. at 484.  The court explained:

> Some courts have held that failure to comply with a court order constitutes
> willful and malicious conduct as a matter of law within the meaning of §
> 523(a)(6). *See, e.g.*, In re Allison, 176 B.R. 60, 64 (Bankr. S.D. Fla. 1994). We do
> not believe, however, that it is necessary in the present circumstances to
> express a view one way or the other on that matter. In this case, the Missouri
> state court that entered the contempt order found explicitly that Mr. Nangle's
> conduct was "willful." That court, moreover, stated that Mr. Nangle's actions
> were "designed to interfere with [Ms. Siemer's] efforts to collect the
> judgment entered against him herein." It follows that Mr. Nangle's conduct
> was malicious because it was "targeted at the creditor . . . at least in the sense
> that the conduct is certain or almost certain to cause . . . harm," Long, 774

---

[8] In Suarez, the bankruptcy appellate panel held that attorneys fees and costs assessed against the Chapter 7 debtor and in favor of her ex-husband's new wife based on her willful and malicious conduct in repeatedly violating a state court order that enjoined her from contacting, molesting, harassing, attacking, threatening, assaulting, or telephoning the new wife and that required her to maintain 100 yard distance from the new wife, were nondischargeable in bankruptcy as being for "injury" that debtor had inflicted, even in absence of any compensatory judgment debt.

F.2d at 881.

Although the bankruptcy appellate panel concluded that "the record is insufficient to determine" whether Mr. Nangle's contempt was intended to inflict injury on Ms. Siemer or on the court itself, it is not a matter of mutually exclusive alternatives:  We think it perfectly clear that the state court held that Ms. Siemer was a target, if not the only target, of Mr. Nangle's willful refusal to obey the court order.

Finally, we believe that the contempt order is a final judgment for collateral estoppel purposes. The bankruptcy appellate panel held otherwise because it concluded that under the relevant state law a civil contempt order is not final until it has been enforced. Although that is true for the purposes of an appeal, "'[r]ecent decisions have relaxed traditional views of the finality requirement'" in the collateral estoppel context by applying the doctrine "'to matters resolved by preliminary rulings or to determinations of liability that have not yet been completed by an award of damages or other relief,'" let alone enforced, *see* John Morrell v. Local Union 304A, 913 F.2d 544, 564 (8th Cir.1990) (quoting 18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 4434 at 321 (1981)), *cert. denied*, 500 U.S. 905, 111 S.Ct. 1683, 114 L.Ed.2d 78 (1991). According to the Restatement (Second) of Judgments § 13 cmt. b (1982), moreover, "execution or enforcement" are not pre-requisites for meeting the finality standard of claim preclusion, and, by implication, the finality standard of collateral estoppel as well.

Nangle, 274 F.3d at 484-85.  In Nangle, there was an underlying judgment sufficient to establish the willful and malicious conduct based on actual litigation.  The Eighth Circuit concluded that the contempt judgment could be afforded collateral estoppel effect, thus reversing the bankruptcy appellate panel, finding that the contempt judgment essentially enhanced "a judgment that it had already held nondischargeable because it consisted of punitive damages and thus bespoke malice on the part of the debtor."  Id. at 484 ("Mr. Nangle's acts involved an actual or deliberate intention to harm Ms. Siemer.").  *See* Steier v. Best (In re Best), 109 F.App'x 1, 7 (6th Cir. 2004).

33

Similarly, the decision in <u>In re Williams</u>, 337 F.3d 504 (5th Cir.   2003), is distinguishable because in that case the debtor failed to abide by an agreed judgment.  The Fifth Circuit based its conclusion on the finding of the district court that the debtor "purposefully and willfully" violated the agreed judgment.   The court observed:

> At the contempt hearing, Williams [the debtor] admitted that he had notice of the Agreed Judgment and that it was clear and unambiguous, that he had continued to use non-union electricians on commercial projects, and that he had not yet paid the restitution for his earlier breach of the CBA [collective bargaining agreement]. The district court found Williams in contempt and imposed sanctions, which included attorney's fees and additional restitution. A second audit was performed for the period between the entry of the Agreed Judgment in December of 1999 and the contempt hearing in April of 2000. This audit revealed Union electricians had been deprived of $106,911.43 in wages and benefits when Williams hired non-union workers. From the record, it appears that the attorney's fees incurred in the contempt hearing are included in this figure.

337 F.3d at 511. *See also* <u>The Spring Works, Inc. v. Sarff (In re Sarff)</u>, 242 B.R. 620, 627-28 (B.A.P. 6th Cir. 2000); <u>Dentrust Dental Internat'l v. Rosenberg (In re Rosenberg)</u>, No. 05-1587, 2007 WL 2156282 at *4 (Bankr. N.D. Ohio July 23, 2007) (collateral estoppel prevented debtor from relitigating contempt order with respect to willful and malicious injury caused by violation of non-compete agreement); <u>Heyne v. Heyne, (In re Heyne)</u> 277 B.R. 364, 369 (Bankr. N.D. Ohio 2002)("a finding of contempt-which at the very least requires that the alleged contemptor must have knowingly disobeyed the underlying order-clearly lends itself to a finding of a deliberate and intentional act"); <u>Bundy American Corp. v. Blankfort (In re Blankfort)</u>, 217 B.R. 138, 145 (Bankr. S.D.N.Y. 1998)(the "existence of the Injunction Order and the defendants' defiance of it removes the Contempt Judgment from the

34

category of ordinary judgments for violation of common law or statutory duties . . . the

Debtors' persistent violations of the Injunction Order . . . constitute the type of aggravating

circumstances which the courts in the Second Circuit and elsewhere have found to be

sufficient to satisfy the 'malicious' requirement of subsection (6)"); Buffalo Gyn

Womenservices, Inc. v. Behn (In re Behn), 242 B.R. 229, 238 (Bankr. W.D.N.Y. 1999)("when

a court . . . issues an injunction . . . telling a specific individual what actions will cross the

line into injury to others, then damages resulting from an intentional violation of the order

are ipso fact the result of a 'willful and malicious injury'"); Haeske v. Arlington (In re

Arlington), 192 B.R. 494 (Bankr. N.D. Ill. 1996)(intentional failure to comply with court

orders contained in an injunction satisfies the definition of "willful and malicious");

Shteysel v. Shteysel (In re Shteysel), 221 B.R. 486 (Bankr. E.D. Wis. 1998)(same).

In City of Colton v. Corbly (In re Corbly), 61 B.R. 851 (Bankr. D. S.D. 1986), the court

attempted to formulate a methodology for determining whether contempt orders are

nondischargeable.  It stated:

> Courts determining contempt nondischargeability under this section find it
> dependent on whether the judgment is compensatory or imposed to uphold
> the dignity of the court. In re Marini, 28 B.R. 262, 265 (Bkrtcy. E.D.N.Y. 1983);
> In re Gedeon, 31 B.R. 942, 945-46 (Bkrtcy. D. Colo.1983)  (civil or criminal
> contempt nature is determinative); Parker v. United States, 153 F.2d 66, 70-73
> (1st Cir. 1946); see also, Guariglia v. Community Nat'l Bank & Trust Co., 382
> F.Supp. 758 (E.D.N.Y.1974); In re Bell, 53 F.Supp. 993 (E.D.N.Y. 1943). A
> judgment which is compensatory and not imposed to uphold the dignity of
> the court is not precluded discharge under this section. In re Marini, 28 B.R.
> at 265; In re Gedeon, 31 B.R. at 945.
>
> Courts are not bound by the judgment's criminal or civil contempt
> characterization but must look to surrounding circumstances for determining

its true nature. Id. A requirement that the contempt judgment is directly payable to a creditor is not necessarily determinative of whether it is compensatory or imposed to uphold the dignity of the court. Id. Unfortunately, courts addressing this issue have not been uniform as to what factors may be considered for determining the true nature of the contempt judgment.

In re Corbly, 61 B.R. at 856-57.  In Corbly, the court determined that a portion of a contempt judgment was nondischargeable under 11 U.S.C. § 523(a)(7), not § 523(a)(6),  because the judgment was to uphold the dignity of the court.  On reconsideration, however, the court declared the debt dischargeable. See In re Corbly, 149 B.R. 125, 127 (Bankr. D. S.D. 1992). Nevertheless, Corbly is an older decision and has not been widely cited.

In Mortgage Capital Advisers, Inc. v. Hawkins (In re Hawkins), No. 99-3537 (MAW), 2001 WL 1820324 (Bankr. D. Del. Mar. 1, 2001), the court considered an award of sanctions against debtors arising from facts similar to those here. The debtors ignored discovery in aid of execution, and the state court, after granting motions to compel, ordered the debtors to pay costs, attorney's fees, and civil sanctions.  In the event the debtors failed to pay, the court ordered that they would be liable to the plaintiff for civil and/or criminal sanctions in the amount of $5,000 per day.  In ruling on a motion for summary judgment, the court framed the issue as follows:  "whether the Delaware Court, after actual litigation, necessarily concluded in a final, valid order that the injury to MCA was caused by a deliberate or intentional action of the Debtors which was substantially certain to cause harm." Id. at *3.  In finding that collateral estoppel did not apply, the bankruptcy court noted that the state court made no express findings that the debtors had acted willfully or

36

maliciously in failing to produce the requested documents.   Moreover, it distinguished numerous cases, including <u>Bundy American Corp. v. Blankfort ( In re Blankfort)</u>, 217 B.R. 138 (Bankr. S.D.N.Y. 1998)(debtor continued to use the franchiser's trademarks and trade names after receiving notice of termination; when franchiser sought to enjoin the debtor's continuing violations., an injunction entered, which the debtor ignored; magistrate made express findings that the debtor had blatantly and willfully violated the contempt orders); and <u>P.P. Wine Int'l, Inc. v. Allison ( In re Allison )</u>, 176 B.R. 60 (Bankr. S.D. Fla. 1994) (violation of the Florida Trade Secrets, being akin to theft, is willful and malicious and sanctions order premised on the debtor's continuing violation of the statute which was a willful and malicious injury).

2. Analysis

Resolution of the issue of whether Peckham willfully and maliciously injured Liddell by failing to respond to discovery in aid of execution of Liddell's judgment and subjecting himself to contempt and civil arrest is not straightforward.  The case law is fact driven, and the holdings in the decisions examined in this Memorandum often are the result of both egregious and affirmative misconduct by debtors in contravention of court orders or injunctions, rather than the virtual paralysis exhibited by Peckham in the instant case in response to the demands made upon him by Liddell and the orders of the Cambridge District Court resulting from Liddell's collection efforts with respect to a debt he had no ability to pay and the stress caused by his inability to pay his mortgage. Moreover, the cases reflect the unsettled area of the law with respect to the interpretation

37

of malice, and many decisions involving contempt follow trials on the merits, rather than

default judgments. Compounding these difficulties, there are few decisions on the issue

in the First Circuit.[9]

This Court agrees with the observations made by the court in <u>Corbly</u>. Twenty years

after the court issued its decision, courts addressing the issue of whether contempt

judgments are nondischargeable are not uniform in their analysis. This Court concludes

---

[9] *But see* <u>Parker v. U.S.,</u> 153 F.2d 66 (1st Cir. 1946), distinguishing between civil and criminal contempt. In <u>Parker,</u> the court stated:

> Proceedings in civil contempt are between the original parties and are instituted and tried as a part of the main cause. Though such proceedings are 'nominally those of contempt', the real purpose of the court order is purely remedial- to coerce obedience to a decree passed in complainant's favor, or to compensate complainant for loss caused by respondent's disobedience of such a decree. If imprisonment is imposed in civil contempt proceedings, it cannot be for a definite term. The respondent can only be imprisoned to compel his obedience to a decree. If he complies, or shows that compliance is impossible, he must be released, for his confinement is not as punishment for an offense of a public nature. If a compensatory fine is imposed, the purpose again is remedial, to make reparation to a complainant injured by respondent's disobedience of a court decree. While respondent may be confined to coerce payment of the compensatory fine, he must be released if he pays the fine or shows his utter inability to do so-confinement beyond that point would be punitive, not remedial. If complainant makes a showing that respondent has disobeyed a decree in complainant's favor and that damages have resulted to complainant thereby, complainant is entitled as of right to an order in civil contempt imposing a compensatory fine. The court has no discretion to withhold the appropriate remedial order. In this respect the situation is unlike that of criminal contempt where the court in its discretion may withhold punishment for the past act of disobedience. *An order imposing a compensatory fine in a civil contempt proceeding is thus somewhat analogous to a tort judgment for damages caused by wrongful conduct.*

<u>Id.</u> at 70 (citations omitted) (emphasis supplied).

that in the absence of collateral estoppel, the contempt judgment must be based on conduct

of the debtor that is both willful and malicious for that judgment to be nondischargeable

under § 523(a)(6), and that the surrounding circumstances will determine the true nature

of the debtor's conduct, without regard to whether the contempt order was compensatory

or imposed to uphold the dignity of the court. *See* In re Corbly, 61 B.R. at 856-57.

The judgment of the Cambridge District Court contains no findings that would

permit this Court to conclude that it determined that Peckham acted willfully and

maliciously for purposes of applying collateral estoppel in this adversary proceeding. As

the court in FL Receivables Trust 2002-A v. Fernandez (In re Fernandez), No. 06–2059, 2008

WL 268975 (Bankr. D. Conn. Jan. 29, 2008), recognized in the context of the federal rules

governing discovery:

> Sanctions for failure to comply with a discovery order are governed by Fed.
> R. Civ. P. 37, made applicable in bankruptcy proceedings by Fed. R. Bankr.
> P. 7037. *See, e.g.* Societe Internationale Pour Participations Industrielles Et
> Commerciales, S.A. v. Rogers, 357 U.S. 197, 206-207, 78 S.Ct. 1087, 1092-1093
> (1958) (sanctions for "noncompliance with a production order depends
> exclusively upon Rule 37, which addresses itself with particularity to the
> consequences of a failure to make discovery"); Evans v. State of Connecticut,
> 967 F.Supp. 673, 689 (D. Conn.1997), *aff'd*, 24 Fed.Appx. 35 (2d Cir. 2001)
> ("Since there was a court imposed-discovery order in this case, Rule 37
> sanctions are applicable."). Rule 37 provides a broad range of sanctions that
> may be imposed by the court for failure to comply with discovery orders,
> ranging from reimbursement of a movant's attorney's fees and costs to entry
> of a default judgment against a noncompliant party. Willfulness is not a
> precondition for the imposition of Rule 37 sanctions, but may be a
> consideration in a court's exercise of its discretion to enter judgment against
> the offending party, widely considered the harshest of sanctions. Societe
> Internationale, 357 U.S. at 208 ("[T]he willfulness or good faith of petitioner,
> can hardly affect the fact of noncompliance and are relevant only to the path
> which the District Court might follow in dealing with petitioner's failure to

comply."). Imposition of attorney's fees, the "mildest sanction," for violation of a discovery order does not require a finding of willfulness. Evans, 967 F.Supp. at 689.

2008 WL 268975 at *5.[10]  *See also* Atlas Tack Corp. v. Donabed, 47 Mass. App. Ct. 221, 224 (1999) ("Willful noncompliance was eliminated in 1984 as a prerequisite to the imposition of sanctions [under Mass. R. Civ. P. 37] 'to increase compliance with discovery orders, by making it easier for parties to achieve, and judges to award, sanctions for the failure to comply with a discovery order.'").  Moreover, and more importantly,

> . . . [S]ection 523(a)(6) does not make "contempt" sanctions nondischargeable, and neither does any other subpart of section 523(a). Section 523(a)(6) says that a debt resulting from a "willful and malicious injury" is nondischargeable. 11 U.S.C. § 523(a)(6).  Whether the sanctions against the Debtor] are nondischargeable accordingly depends, not on whether they are labeled as "contempt" or as something else, but on whether the conduct leading to them was "willful and malicious."

Pearle Vision, Inc. v. Romm (In re Romm), 2006 WL 3692416 at *3 (Bankr. N.D. Ill. Dec. 13, 2006).  *See also* Suarez v. Barrett (In re Suarez), 400 B.R. 732, 736-37 (B.A.P. 9th Cir. 2009).

Peckham ignored the court's order to produce discovery, but this Court is unable to infer that he did so with the requisite intent to harm Liddell.  The sanctions imposed by the Cambridge District Court were imposed to either compel Peckham's obedience or to compensate Liddell.  While the court indicated its intent to punish Peckham, Peckham could have avoided the daily sanction through compliance. Peckham's conduct violated the dignity of the Court, but there was no evidence that he intended to harm Liddell in not appearing in the Cambridge District Court or obeying its orders.  In other words, the Court

---

[10] *Cf.* Mass. R. Civ. P. 37(b).

cannot find that there was  a "deliberate or intentional injury" as opposed to a deliberate

or intentional act by Peckham.  In the instant case, Peckham failed to act,  leading to injury,

namely Liddell's liability for legal fees.  *See* <u>Geiger</u>, 523 U.S. at 61.  Indeed, Peckham's

whole course of action in the state court matter was to ignore his dire predicament which

ultimately led to his arrest.  Peckham took no affirmative steps to address his financial

crisis until he was faced with incarceration.  As the Eighth Circuit observed in <u>Blocker v.

Patch (In re Patch)</u>, 526 F.3d 1176 (8th Cir. 2008):

> As an abstract legal matter, the BAP concluded that the failure to act in the
> face of a duty can constitute an intentional tort. But we question whether a
> debtor's breach of a legal duty to act can ever constitute a "willful . . . injury,"
> as the Supreme Court and this circuit have interpreted § 523(a)(6) consistent
> with the  Restatement (Second) of Torts.

526 F.3d at 1181-82.[11]

---

[11] The Eight Circuit added:

The Restatement appears to take the categorical position that the failure to
act in the face of a legal duty can never constitute an intentional tort. "The
Restatement speaks only of an act (not of an omission) in defining intent,
in § 8A, and requires an act, as distinguished from inaction, for battery. . .
." W. Page Keeton et al., Prosser and Keeton on Torts § 8, at 36 n. 6 (5th
ed.1984). Correspondingly, the Restatement characterizes an actor's
deliberate breach of a legal duty to protect as negligence. <u>Id.</u> On the other
hand, while the Supreme Court's decision in <u>Geiger</u>, and our en banc
decision, relied on the Restatement in interpreting the meaning of "willful
. . . injury" under § 523(a)(6), neither decision requires strict adherence to
every particular of the Restatement, and neither decision can be read for
the broad rule that a debtor's breach of a legal duty to act can never be
"willful" under § 523(a)(6). The propriety of any such categorical rule is
questionable. *See* Keeton, *supra*, § 8, at 36 n. 6 ("This curious usage is
confounding, since there is as clear a distinction (1) between purposely
failing to act, in order to produce a desired consequence, and failing to act
without adverting to that consequence, as (2) between purposely acting to

41

This Court finds that Liddell not only failed to establish that Peckham acted with the requisite intent to injure, he failed to establish that he acted without just cause or excuse for purposes of both components of § 523(a)(6). *See* Bauer v. Colokathis, 417 B.R. 150, 158 (Bankr. D. Mass. 2009). Peckham testified that he suffered from severe depression, which together with his financial problems and lack of income, manifested itself in his failure to defend the Cambridge District Court action or produce discovery. Additionally, in the context of this case, malice as defined as "without just cause or excuse" is lacking. In Bundy Am. Corp. v. Blankfort (In re Blankfort), 217 B.R. 138 (Bankr. S.D.N.Y. 1998), the Court stated:

> [T]he statutory element of maliciousness will be found by imputation where the debtor has breached a duty to the plaintiff founded in contract, statute or tort law, willfully in the sense of acting with deliberate intent, in circumstances where it is evident that the conduct will cause injury to the plaintiff and, most important, and under *some aggravating circumstance* such as to warrant denial of discharge. In the absence of a finding of "Biblical malice," an ordinary tort or breach of contractual or statutory duty generally is not sufficient to deny discharge under subsection (6) without some aggravating circumstance evidencing conduct so reprehensible as to warrant denial of the "fresh start" to which the "honest but unfortunate" debtor would normally be entitled under the Bankruptcy Code.

217 B.R. at 144 (emphasis supplied). The Court can find no aggravating circumstances here.

Peckham had advised Liddell repeatedly of his financial woes. Indeed, Liddell

---

produce a desired consequence and acting without adverting to that consequence."). . . .

526 F.3d at 1182.

42

intimated that he was tired of hearing about Peckham's financial problems.  Moreover,

Liddell knew that Peckham had been evicted from the Rogers Street premises because he

had permission from the new tenant to inspect his piano at that location.  In short, Liddell

and his attorney had information from Peckham and could have obtained more from

public records to conclude that there was little likelihood that Peckham would be able to

satisfy a $27,000 judgment.  While Liddell had every right to pursue discovery in aid of his

execution, and Peckham's failure to respond exhibited poor judgment, Peckham knew he

would be unable to satisfy any judgment Liddell might obtain.  Depressed and

unemployed, he failed in his duty to respond to Liddell's legitimate requests and to the

orders of the Cambridge District Court.  He buried his head in the sand and presumably

hoped that the whole matter would go away.  The Court cannot find, however, that he

acted willfully or maliciously.[12]

    C. Forbearance Claim

        1. Applicable Law

In Ojeda v. Goldberg, 599 F.3d 712 (7th Cir. 2010), the United States Court of

Appeals for the Seventh Circuit set forth the standard for evaluating a claim for a

fraudulently induced forbearance.  It stated:

---

[12] The Court recognizes that Liddell produced substantial evidence of the
Debtor's lack of truthfulness in the form of his false loan application, his
misrepresentations to Liddell and Bergmann as to the status of repairs and delivery of
their pianos, and his failure to list pianos held for others in his Schedules.  Making false
representations in other contexts, however, is not a component of a cause of action
under section 523(a)(6), and the Court addressed the issue with respect to Liddell's
claim under 523(a)(2)(A).

In determining whether a forbearance is fraudulently induced, the creditor must prove that "'[1] it had valuable collection remedies at the time of the misrepresentation, [2] it did not exercise those remedies based upon the misrepresentation, and [3] that the remedies lost value during the extension period.'" In re Kucera, 373 B.R. 878, 885 (Bankr. C.D. Ill. 2007) (quoting In re Beetler, 368 B.R. 720, 730-31 (Bankr. C.D. Ill. 2007)).

599 F.3d at 719.

2. Analysis

Liddell argues that "through a forbearance induced by Peckham's misrepresentations commencing at least with those he made on August 30, 2005, and extending to his promised delivery of the piano on July 11, 2006, Liddell effectively extended credit to the Debtor." Liddell contends that had he acted a few months sooner he would have been able to levy his judgment on the interest the Peckhams held in The 66 Sumner Street Trust to which they transferred their home in July of 2006. Citing Mass. Gen. Laws ch. 223, § 67 with respect to pre-judgment attachments, Liddell reasons as follows:

The Peckhams . . . would not have been able to refinance out of the Trust - - as they did in January 2007 - - without addressing Liddell's lien. It is thus highly likely that Liddell would have had the leverage at that time to collect at least some portion of the judgment held, even if not the full sum.

The Court finds that Liddell failed to sustain his burden with respect to his forbearance argument under 11 U.S.C. § 523(a)(2)(A). In the first place, he did not establish that he had any valuable collection remedies in 2006 and he certainly did not establish that the remedies lost value during the time of forbearance. The Court was presented with no credible evidence of the property's value. The values ascribed to the property in the mortgage loan application are not compelling, particularly in view of the absence of any

44

appraisal reports and the price obtained for the property by the Trustee.  Moreover, when

Liddell commenced his action in the Cambridge District Court he either did not seek or

obtain an attachment.  The Court takes judicial notice that in his proof of claim, Liddell

asserted as grounds for his secured claim the levy of execution, which is dated April 30,

2007, after the March 9, 2007 judgment.  In sum, the Court rejects Liddell's forbearance

claim as speculative.

**V. CONCLUSION**

      In view of the foregoing, the Court shall enter judgment in favor of Liddell and

against Peckham in the sum of $2,000.

                           By the Court,

                           Joan N. Feeney
                           United States Bankruptcy Judge

Dated: September 13, 2010
cc: Harvey S. Shapiro, Esq., Mark L. Nestor, Esq.

45